# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAVIER ROMERO OQUITA,<br><br>　　　　Petitioner,<br><br>　　v.<br><br>RALPH DIAZ,<br><br>　　　　Respondent. | Case No. 1:19-cv-00670-AWI-SAB-HC<br><br>FINDINGS AND RECOMMENDATION RECOMMENDING DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

## I.

## BACKGROUND

On December 16, 2015, Petitioner was convicted by a jury in the Tulare County Superior Court of two counts of committing a forcible lewd act upon a child under fourteen and one count of showing or sending harmful matter to seduce a minor. (1 CT[1] 151–53, 170). Petitioner was sentenced to an imprisonment term of eleven years. (1 CT 170). On March 13, 2018, the California Court of Appeal, Fifth Appellate District affirmed the judgment. People v. Oquita, No. F073234, 2018 WL 1281971 (Cal. Ct. App. Mar. 13, 2018). On May 16, 2018, the California Supreme Court denied the petition for review. (LDs[2] 13, 14).

---

[1] "CT" refers to the Clerk's Transcript on Appeal lodged by Respondent on July 23, 2019. (ECF No. 16).
[2] "LD" refers to documents lodged by Respondent on July 23, 2019. (ECF No. 16).

1

On May 16, 2019, Petitioner filed the instant federal petition for writ of habeas corpus. (ECF No. 1). On July 22, 2019, Respondent filed an answer. (ECF No. 14). To date, Petitioner has not filed a traverse, and the time for doing so has passed.

## II.

## STATEMENT OF FACTS[3]

**I. Prosecution Case**

**A. M.H.**

> Victim M.H., who is defendant's nephew, was 13 years old at the time of the offenses committed against him and at the subsequent trial.[4] M.H. testified that in early August 2015, he and defendant left El Centro for Sanger to visit family. Defendant previously lived with M.H.'s family and M.H. testified that prior to this trip, they were close and had a good relationship.
>
> After they departed, defendant began talking about sexually explicit topics, including having sex with men and women, engaging in oral sex and hiring prostitutes. Defendant also talked to M.H. about defendant's penis, he had "lube" with him and he told M.H. he had "a lot [of condoms] in his luggage." M.H. alerted his mother by phone that things were "strange" and she began to call M.H. every 30 to 60 minutes. As they traveled, M.H. was unaware of their location because defendant would tell him one thing, but M.H. would see road signs that said another. At one point, defendant told M.H. to tell his mother they were staying in Pasadena with friends and not to tell her they were staying in a motel. When they stopped at a restaurant to eat, M.H. called his mother from the restroom and told her what defendant was saying. He also told her that defendant told him to lie to her.
>
> M.H. testified that in the car, defendant kept grabbing his own penis and rubbing it. He also kept talking about sexual things to M.H. M.H. stated he and defendant had never had a conversation like that before and while he had not previously felt uncomfortable around defendant, this conversation made him very uncomfortable.
>
> M.H. also testified he saw defendant take pills several times. One time defendant crushed the pill and ate it. Another time, he sent M.H. inside to pay for gasoline and told M.H. "he couldn't get [out] because he had [a] boner." As M.H. was returning to the car, he saw defendant take another pill. Defendant continued to rub himself and talk about sexual things.
>
> M.H. testified defendant told him that by the end of the trip he was going to have several hundred dollars. After first telling M.H. they were going to stop in Pasadena, defendant said they were about 30 minutes from Sanger but were going to stop at a motel because he was tired, although he did not appear to be tired to M.H. Defendant told M.H. he was going to do something for defendant and when M.H. asked what defendant meant, defendant said he would see. Defendant also told M.H. he was going to help defendant do something before defendant went to

---

[3] The Court relies on the California Court of Appeal's March 13, 2018 opinion for this summary of the facts of the crime. See Vasquez v. Kirkland, 572 F.3d 1029, 1031 n.1 (9th Cir. 2009).

[4] We refer to the victim and some witnesses by their initials. (Cal. Rules of Court, rule 8.90(b)(4), (11).)

2

sleep and defendant would give him another $100 in the morning. Defendant told M.H. not to say anything about their location, the motel, what defendant was saying or the things defendant wanted to do.

M.H. expected the motel room to have two beds, but it only had one. M.H. testified he got underneath both blankets on the bed. Defendant told him they were both going to shower because he wanted M.H.'s "butt to be clean." M.H. responded that he did not need a shower and he told his two sisters by text what was happening. M.H. had told his mother he and defendant were at a motel and she called defendant, who was then in the bathroom taking a shower.

Defendant eventually came out of the bathroom with only a towel wrapped around him. He laid down next to M.H. on the bed and took off his towel, exposing his naked body. M.H. testified that when defendant got under the blankets, he got back on top of the blankets. Defendant then moved the blankets out of the way.

Defendant pulled M.H. closer to him, as if to cuddle with him. M.H. kept pulling away. Defendant grabbed M.H.'s hand and moved it toward defendant's penis approximately three times, but M.H. pulled his hand away. Defendant also put a $100 bill under his penis and told M.H. to get it, but M.H. did not do so. Defendant put his hand behind M.H.'s head and pushed it down toward defendant's penis. Defendant kept telling him, "[J]ust a little," which M.H. interpreted to mean engage in oral sex.

At first, the news was on the television, but, after defendant showered, he changed the channel to something pornographic. Defendant kept fondling his own penis and telling M.H. to watch the pornographic movie with him, but M.H. declined to do so.

M.H.'s mother called him again and he then told defendant he needed to charge his phone. Defendant directed M.H. to use the charger in the car and he unlocked it for M.H. Defendant then winked at M.H., said he had to take care of some business and went back inside the motel room. When M.H. told his mother what was going on, she told him to run and call 911. M.H. then ran and hid behind a green shipping container near a gas station. As he was waiting for police to arrive, he saw defendant drive by twice.

**B. L.G.**

M.H.'s mother, L.G., testified she lives in El Centro and defendant is her uncle. She explained she, defendant and M.H. had planned to travel to Sanger together, but she was unable to go because of a medical appointment. Defendant used to live with her, and M.H. would sometimes go to the store with him, but the trip to Sanger was the first long trip M.H. had taken alone with defendant. L.G. testified she had a lot of confidence in defendant and trusted him to take care of her son.

L.G. testified that after defendant and M.H. left on their trip, something M.H. told her over the phone made her uncomfortable.[5] As a result, she talked to M.H. many times during the trip. She also talked to defendant to distract him and she sometimes spoke with both of them at the same time on two separate phones, one on each ear.

---
[5] L.G. was directed not to state what M.H. told her.

3

At one point, defendant told L.G. they were in Pasadena. She told M.H. to look for road signs, but he was very nervous and unable to tell her where they were because defendant "was having a strange conversation." L.G. testified defendant never told her they were staying at the motel, but M.H. did. She told M.H. to be careful and watch his uncle, and to run and call the police if he felt fearful or in danger.

### C. Other Testimony

Tulare County Sheriff's Deputies Sara Olmos and Jerry Diaz testified. Olmos testified that she recovered from defendant's travel bags cell phones, five packages of blue, individually packaged pills labeled Edegar and two packages of 21–24 individually packaged pills labeled Vivarin/caffeine alertness aid pills.

Diaz responded to M.H.'s 911 call and located him behind the green shipping container. He testified M.H. was nervous and scared, and was hiding from his uncle. M.H. told police that defendant had crushed up a pill and taken it. He also told them that defendant placed his hand behind M.H.'s head, pushed it toward defendant's penis and said, "Just try it for a little bit. Put it in your mouth." M.H. jerked his head away at that point and defendant told him not to tell anyone. M.H. also told Diaz that prior to arriving at the motel, defendant was having sexual conversations with him, and he had a gut feeling it was wrong and called his mother.

When Diaz subsequently entered the motel room, a pornographic movie was playing on the television and, during a recorded questioning, defendant told Diaz he took a Viagra and was planning to look for a male or female sex partner at a nightclub, although he could not name the club. Diaz also testified that at the time of questioning, he observed defendant had an erection.

Defendant told Diaz he wanted to watch pornography because he was sexually aroused and he confirmed M.H. was in the room. Defendant said he only touched M.H.'s head to push it away so he could go outside to make a telephone call. After M.H. left, defendant told him not to go anywhere, to stay in the car, and not to talk to anyone. Defendant told Diaz a few times that he "wanted ... to take care of business," by which defendant meant masturbate. Diaz also testified that defendant told him the motel offered them a room with two beds, but defendant requested a single bed and said M.H. was like a son to him. Defendant further stated that he told M.H. he was always alone, but this time he had M.H. with him, and that he told M.H. not to say anything.

On cross-examination, Diaz testified defendant denied having any sexual intent toward M.H. or making any sexual advances toward him. Defendant also stated he did not intentionally expose his penis to M.H. and he denied placing any money under his penis and telling M.H. to get it. He told Diaz that M.H. was a liar.

### II. Defense Case

The defense called three witnesses to testify about defendant's good character. Defendant's sisters, V.P. and M.F., testified that defendant lived with them at times and he never engaged in any inappropriate conduct with their children. Both also testified that defendant would sometimes give their children money, but he did not expect anything in return. C.R., whose sons are defendant's nephews, also

4

testified that he never behaved inappropriately toward her children and would give them money for things without expecting anything in return.

M.F. testified that when defendant came to visit, he always stayed in a motel about 20 miles away and arrived at the house in the morning. She said he never disturbed them in the middle of night.

Additionally, V.P. spoke with M.H. and L.G. after defendant was arrested. She testified M.H. denied that defendant touched him or did anything to him, and he told her his mother told him to run and call 911. M.H. told V.P. there was a pornographic movie on the television, but that was not why he called the police. V.P. testified that when she told M.H. he knew what he did and asked him what he was doing, he smiled and told her just to pay defendant's bail. She conceded, however, that she did not know what M.H. and his mother said during their telephone conversations, and she did not know why L.G. told M.H. to run. She also conceded that when she asked M.H. why defendant was arrested, he told her, "I know what he wanted and where that was going."

Defendant also testified. He said he had planned to spend two weeks in Sanger visiting family and was going alone until L.G. asked him to take M.H. with him. However, L.G. did not have any money and M.H. needed some items, including razors, so defendant told them both he would give M.H. $100.

Defendant picked M.H. up around 4:00 in the afternoon. He testified that after they departed, M.H. asked him if he was buying M.H.'s company and told him L.G. said he was paying for M.H.'s accompaniment. Defendant responded that he had not planned to take M.H., M.H. was a hindrance to him, and the money he gave M.H. was for razors, pizza and candies for everyone.

Defendant testified M.H. was making many phone calls, was impatient and nervous, and was texting a lot. Defendant said he was pointing out road signs to M.H. and telling him where they were as they traveled. He denied he told M.H. to lie about seeing friends in Pasadena and he denied he told M.H. to lie to his mother at all. He admitted, however, that he lied to M.H.'s mother about staying with friends in Los Angeles.

Defendant testified that just prior to reaching Kingsburg at approximately 2:00 in the morning, he checked out a rest stop and told M.H. he was going to ask a favor. He said he was going to rent a motel room for M.H., have a beer and cigarette, and return to the rest stop. He asked M.H. what time he should pick M.H. up in the morning and M.H. told him 10:00. Defendant told M.H. not to tell his mother defendant was going to leave the room and return to the rest stop, but he said he knew M.H. was going to tell her because he was telling her everything.
When defendant went to take a shower, L.G. called him and told him to continue on to Sanger, but he told her it was too late. She told him M.H. was a very nervous person and was scared of everything.

After his shower, defendant wrapped a towel around his waist. M.H. was asleep on the bed underneath the top cover. Defendant testified he laid down and told M.H. to get his pillow from the car. When M.H. went to lie down again, defendant told him to get under the bottom cover. Defendant started to change the television channels and a pornographic movie came on. M.H. was texting and defendant told him to get out. After M.H. said he needed to charge his phone, defendant told him to go, grabbed him and pushed him. Defendant testified he told M.H., "You know what, get out. Get out." Defendant explained he was angry

5

because he was fed up with all the calls. After M.H. refused to leave, defendant got up. He threw off his towel and put his shorts on. He told M.H. to get out of the room and stay in the car. Defendant opened the car for M.H. and told him to stay in the car, not to talk to anyone and not to open the door for anyone.

Defendant testified he later told M.H. he was going, but would leave the car there. He then returned to the room and was watching the movie when M.H.'s sister called. She wanted to talk to M.H. When defendant opened the door, M.H. was not in the car so he told M.H.'s sister that M.H. had gone to the store. He then grabbed his keys and went to look for M.H.

On cross-examination, defendant testified that once a year, he would go to the rest stop to meet a stranger for sex. When asked why he did not then just rent a second room at the motel, defendant said he did not know if he was going to do that or go somewhere with whomever he met.

Defendant acknowledged telling police he wanted to watch a pornographic movie, but denied telling them he was sexually aroused or had an erection. He testified he took a Viagra about 30 minutes before reaching the motel in case he met someone at the rest stop for sexual relations, but he did not have an erection. He said that after driving by the rest stop to check it out, he pointed out to M.H. where he would be and he rented the motel room. He also acknowledged he was offered a room with two beds in it, but he only needed one bed because M.H. was like a son to him.

Although defendant's statement to police was recorded and transcribed, defendant continued to maintain that he did not tell police he had an erection because of the Viagra he took. He also maintained that he told police he was planning to go to the rest stop, although no such statement was in the transcript.

Defendant acknowledged he told M.H. about meeting people at the rest stop for sex. When questioned by the prosecutor regarding why he would talk to a 13–year–old about having sex with strangers, defendant said M.H. stated he also had sexual relations.

Defendant testified he did not get under the covers with M.H. and, prior to lying down on the bed, he had told M.H. to leave. He testified he wanted "to get ready," and because he had a bad trip with M.H., "it wasn't easy ... to get horny." He then denied wanting to get "horny." but said he had not "experimented [before] with Viagra." When asked if he winked at M.H. and told M.H. he was going to take care of business in the room, defendant responded, "Not really." Questioned about that equivocation, he said he "wasn't [paying] too much attention as to what was going on but [he] was putting on sandals, a T-shirt." He acknowledged the pornographic movie continued to play and was still playing when the police arrived at the motel room.

Finally, defendant testified he and M.H. had a good relationship prior to the road trip, and they did not fight that day or prior to that day. He also said there was no reason for M.H. to be mad at him and he did not know why M.H. would lie about defendant getting naked, pulling M.H.'s hand toward his penis and pushing M.H.'s head toward his penis.

Oquita, 2018 WL 1281971, at *1–6 (footnotes in original).

///

# III.

# STANDARD OF REVIEW

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. The challenged convictions arise out of the Tulare County Superior Court, which is located within the Eastern District of California. 28 U.S.C. § 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997) (en banc). The instant petition was filed after the enactment of AEDPA and is therefore governed by its provisions.

Under AEDPA, relitigation of any claim adjudicated on the merits in state court is barred unless a petitioner can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Harrington v. Richter, 562 U.S. 86, 97–98 (2011); Lockyer v. Andrade, 538 U.S. 63, 70–71 (2003); Williams, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71 (quoting 28 U.S.C. § 2254(d)(1)). In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Id. In addition,

the Supreme Court decision must "'squarely address [] the issue in th[e] case' or establish a legal principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in . . . recent decisions"; otherwise, there is no clearly established Federal law for purposes of review under AEDPA. Moses v. Payne, 555 F.3d 742, 754 (9th Cir. 2009) (quoting Wright v. Van Patten, 552 U.S. 120, 125 (2008)); Panetti v. Quarterman, 551 U.S. 930 (2007); Carey v. Musladin, 549 U.S. 70 (2006). If no clearly established Federal law exists, the inquiry is at an end and the Court must defer to the state court's decision. Musladin, 549 U.S. 70; Wright, 552 U.S. at 126; Moses, 555 F.3d at 760.

If the Court determines there is governing clearly established Federal law, the Court must then consider whether the state court's decision was "contrary to, or involved an unreasonable application of, [the] clearly established Federal law." Lockyer, 538 U.S. at 72 (quoting 28 U.S.C. § 2254(d)(1)). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 412–13; see also Lockyer, 538 U.S. at 72. "The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in character or nature,' or 'mutually opposed.'" Williams, 529 U.S. at 405 (quoting Webster's Third New International Dictionary 495 (1976)). "A state-court decision will certainly be contrary to [Supreme Court] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases." Id. If the state court decision is "contrary to" clearly established Supreme Court precedent, the state decision is reviewed under the pre-AEDPA de novo standard. Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008) (en banc).

"Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413. "[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411; see also Lockyer,

538 U.S. at 75–76. The writ may issue only "where there is no possibility fair minded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." Richter, 562 U.S. at 102. In other words, so long as fair minded jurists could disagree on the correctness of the state court's decision, the decision cannot be considered unreasonable. Id. If the Court determines that the state court decision is objectively unreasonable, and the error is not structural, habeas relief is nonetheless unavailable unless the error had a substantial and injurious effect on the verdict. Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

The Court looks to the last reasoned state court decision as the basis for the state court judgment. Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011). If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, this Court may consider both decisions to ascertain the reasoning of the last decision. Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Richter, 562 U.S. at 99. This presumption may be overcome by a showing "there is reason to think some other explanation for the state court's decision is more likely." Id. at 99–100 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)).

Where the state courts reach a decision on the merits but there is no reasoned decision, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). Stanley, 633 F.3d at 860; Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes, 336 F.3d at 853. While the federal court cannot analyze just what the state court did when it issued a summary denial, the federal court must review the state court record to determine whether there was any "reasonable basis for the state court to deny relief." Richter, 562 U.S. at 98. This Court "must determine what arguments or theories . . . could have supported, the state court's decision; and then it must ask whether it is

possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Id. at 102.

## IV.

## REVIEW OF CLAIM

In his sole claim for relief, Petitioner asserts that the trial court violated the Due Process Clause of the Fourteenth Amendment by failing to instruct the jury on a lesser offense. (ECF No. 1 at 5).[6] Respondent argues that Petitioner fails to demonstrate any clearly established right to a jury instruction on attempted forcible lewd conduct as a lesser included offense. (ECF No. 14 at 14).

This claim was raised on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned opinion. The California Supreme Court summarily denied Petitioner's petition for review. As federal courts review the last reasoned state court opinion, the Court will "look through" the California Supreme Court's summary denial and examine the decision of the California Court of Appeal. See Wilson, 138 S. Ct at 1192.

In denying Petitioner's instructional error claim, the California Court of Appeal stated:

**I. Instructional Error**

**A. Background**

Defendant was charged with and convicted of two counts of forcible lewd conduct under section 288, subdivision (b)(1). Count 1 was based on defendant's act of moving M.H.'s hand toward defendant's penis and count 2 was based on defendant's act of pushing M.H.'s head toward defendant's penis. In addition to instructing the jury on the charged offense of forcible lewd conduct, the trial court instructed the jury on nonforcible lewd conduct (§ 288, subd. (a) ), attempted nonforcible lewd conduct (§§ 664/288, subd. (a) ), and simple assault (§ 240) as the lesser included offenses. Defendant claims the trial court erred when it failed to also instruct the jury on attempted forcible lewd conduct (§§ 664/288 subd. (b)(1) ) as a lesser included offense.

" 'A trial court has a sua sponte duty to "instruct on a lesser offense necessarily included in the charged offense if there is substantial evidence the defendant is guilty only of the lesser." [Citation.] Substantial evidence in this context is evidence from which a reasonable jury could conclude that the defendant committed the lesser, *but not the greater*, offense. "The rule's purpose is ... to assure, in the interest of justice, the most accurate possible verdict encompassed by the charge and supported by the evidence." [Citation.] In light of this purpose,

---

[6] Page numbers refer to the ECF page numbers stamped at the top of the page.

the court need instruct the jury on a lesser included offense only "[w]hen there is substantial evidence that an element of the charged offense is missing, but that the accused is guilty of" the lesser offense.' " (*People v. Landry* (2016) 2 Cal.5th 52, 96, quoting *People v. Shockley* (2013) 58 Cal.4th 400, 403–404; accord, *People v. Simon* (2016) 1 Cal.5th 98, 132.) "Speculative, minimal, or insubstantial evidence is insufficient to require an instruction on a lesser included offense." (*People v. Simon*, *supra*, at p. 132; accord *People v. Williams* (2015) 61 Cal.4th 1244, 1264; *People v. Harris* (2008) 43 Cal.4th 1269, 1298 & fn. 10.)

"On appeal, we independently review whether a trial court erroneously failed to instruct on a lesser included offense." (*People v. Trujeque* (2015) 61 Cal.4th 227, 271; accord, *People v. Waidla* (2000) 22 Cal.4th 690, 733.)

### B. Analysis

### 1. Invited Error

As an initial matter, we reject the People's argument that the failure to instruct on attempted forcible lewd conduct was invited error. " ' "The obligation to instruct on lesser included offenses exists even when as a matter of trial tactics a defendant not only fails to request the instruction but expressly objects to its being given." ' [Citations.] [¶] Nevertheless, the claim may be waived under the doctrine of invited error if trial counsel both ' "intentionally caused the trial court to err" ' and clearly did so for tactical reasons. [Citation.] Invited error will be found, however, only if counsel expresses a deliberate tactical purpose in resisting or acceding to the complained-of instruction." (*People v. Souza* (2012) 54 Cal.4th 90, 114; accord, *People v. Moore* (2011) 51 Cal.4th 386, 410; see *People v. O'Malley* (2016) 62 Cal.4th 944, 984.)

In this case, the parties stipulated to the jury instructions on the record, but their discussion of the instructions occurred off the record. As a result, we cannot determine whether the instruction was considered or simply overlooked. Given the record's silence on this issue, there is no basis for a finding that trial counsel, as a matter of tactical choice, invited the error. (*People v. Souza*, *supra*, 54 Cal.4th at p. 114; *People v. Moore*, *supra*, 51 Cal.4th at p. 410.)

### 2. Necessity of Instruction

The parties agree attempted forcible lewd conduct is a lesser included offense of forcible lewd conduct. (See *People v. Banks* (2014) 59 Cal.4th 1113, 1160, abrogated in part on another ground in *People v. Scott* (2016) 61 Cal.4th 363, 391, fn. 3; *People v. Shockley*, *supra*, 58 Cal.4th at p. 404; *People v. Braslaw* (2015) 233 Cal.App.4th 1239, 1248.) However, as we have stated, a trial court's sua sponte duty to instruct is triggered only if the lesser included offense was supported by substantial evidence. (*People v. Breverman* (1998) 19 Cal.4th 142, 162 (*Breverman*); accord, *People v. Landry*, *supra*, 2 Cal.5th at p. 96; *People v. Simon*, *supra*, 1 Cal.5th at p. 132.) Therefore, we consider whether there was substantial evidence that an element of the charged offense of forcible lewd conduct was missing but that defendant was guilty of attempted forcible lewd conduct. (*People v. Landry*, *supra*, at p. 96; *People v. Shockley*, *supra*, at pp. 403–404.)

"Section 288[, subdivision ](a) prohibits the commission of a lewd or lascivious act on a child under age 14 done with the intent to arouse or satisfy the sexual desires of the perpetrator or the child." (*People v. Soto* (2011) 51 Cal.4th 229,

11

237.) " '*Any* touching of a child under the age of 14 violates ... section [288], even if the touching is outwardly innocuous and inoffensive, if it is accompanied by the *intent* to arouse or gratify the sexual desires of either the perpetrator or the victim.' " (*People v. Shockley*, *supra*, 58 Cal.4th at p. 404, quoting *People v. Lopez* (1998) 19 Cal.4th 282, 289; accord, *People v. Martinez* (1995) 11 Cal.4th 434, 444–445.) Section 288, subdivision (b)(1), under which defendant was convicted, further prohibits the commission of such an act " 'by use of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person ....' " (*People v. Soto*, *supra*, at p. 237.) "[T]he harsher penal consequences of a conviction under section 288[, subdivision ](b), as compared to section 288[, subdivision ](a), require that the force used for a subdivision (b) conviction be 'substantially different from or substantially greater than that necessary to accomplish the lewd act itself.' " (*Id.* at p. 242.) Relevant here, attempted lewd conduct requires the prosecutor to prove "(1) the defendant intended to commit a lewd and lascivious act with a child under 14 years of age, and (2) the defendant took a direct but ineffectual step toward committing a lewd and lascivious act with a child under 14 years of age." (*People v. Singh* (2011) 198 Cal.App.4th 364, 368; accord, *People v. Villagran* (2016) 5 Cal.App.5th 880, 890; *People v. Hanna* (2013) 218 Cal.App.4th 455, 462.)

Defendant denied touching M.H. inappropriately or making sexual advances toward him. In his appeal, he claims "substantial evidence supported the theory that [his] actions on the way to and within the motel room were merely an attempt or [in]direct step toward committing the charged offenses of forcible lewd act" and "a reasonable jury could have viewed [his] actions and behavior as mere preparation toward the commission of a forcible lewd act, but not a forcible lewd act in itself."

Defendant's argument would have more force if the trial court had not instructed the jury on attempted nonforcible lewd conduct. It did, however, and defendant does not more precisely articulate the basis for his claim that substantial evidence supported an instruction on attempted *forcible* lewd conduct, in addition to and as distinguished from the attempted lewd conduct instruction given.[7] Acceptance of defendant's claim of error would require us to agree there was substantial evidence he intended to commit a forcible lewd act but did not complete the lewd act. In this case, however, the prosecutor's theory was, and the evidence showed, that the acts of pushing M.H.'s hands and head toward defendant's exposed penis were both the force and the lewd acts. Thus, this case did not involve substantial evidence of multiple acts from which a reasonable jury might have found that force was used or initiated, but that the lewd acts were not completed.

As the completed crime of forcible lewd conduct and the attempted crime of forcible lewd conduct require the same mental state (*People v. Singh*, *supra*, 198 Cal.App.4th at p. 368), defendant's argument that he did not make sexual advances or touch M.H. sexually is of no assistance as related to the instructional error claim he advances. In convicting defendant, the jury obviously found that defendant possessed the requisite "intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of" himself or M.H. (§ 288, subd. (a).)

---

[7] Defendant does not direct our attention to any cases that addressed the issue presented here: a challenge to the failure to instruct sua sponte on attempted forcible lewd conduct where an instruction on attempted nonforcible lewd conduct was given. We note that in *People v. Memro* (1985) 38 Cal.3d 658, 697–698, footnote 48, overruled in part on another ground by *People v. Gaines* (2009) 46 Cal.4th 172, 181, footnote 2, the California Supreme Court observed "[t]here are very few appellate decisions involving attempted section 288 violations."

12

Defendant argues he "accused [M.H.] of lying" and "[t]he jury could have reasonably believed that [he] did not forcibly touch [M.H.], but that he was preparing to commit a forcible lewd act." In that event, however, no forcible touching occurred and the attempted nonforcible lewd conduct instruction given was sufficient. On the facts of this case, we are not convinced there was substantial evidence from which a reasonable jury could conclude that defendant committed the lesser offense of attempted forcible lewd conduct but not the greater offense of forcible lewd conduct. In any event, even if we assume the trial court should have instructed the jury sua sponte on attempted forcible lewd conduct, the error was harmless.[8]

### 3. Any Error Harmless

As an initial matter, defendant argues that the federal constitutional standard articulated in *Chapman* applies to his instructional error claim.[9] The California Supreme Court has rejected this argument, however, explaining that "[i]n noncapital cases, 'the rule requiring sua sponte instructions on all lesser necessarily included offenses supported by the evidence derives exclusively from California law.' [Citation.] As such, 'in a noncapital case, error in failing sua sponte to instruct, or to instruct fully, on all lesser included offenses and theories thereof which are supported by the evidence must be reviewed for prejudice exclusively under ... *Watson* [, *supra*,] 46 Cal.2d [at page 836].' [Citations.] ' "[M]isdirection of the jury, including incorrect, ambiguous, conflicting, or wrongly omitted instructions that do not amount to federal constitutional error are reviewed under the harmless error standard articulated" in *Watson*.' [Citations.] '[U]nder *Watson*, a defendant must show it is reasonably probable a more favorable result would have been obtained absent the error.' " (*People v. Beltran* (2013) 56 Cal.4th 935, 955; accord, *People v. Banks*, *supra*, 59 Cal.4th at p. 1161; *People v. Ngo* (2014) 225 Cal.App.4th 126, 158.)

Defendant relies on *People v. Thomas* (2013) 218 Cal.App.4th 630, 646 (*Thomas*), for the proposition that *Chapman* applies. *Thomas*, however, is inapposite. In *Thomas*, the Court of Appeal addressed a claim of instructional error where the trial court refused to give a provocation instruction in a murder case. (*Id.* at p. 633.) The court concluded the error was subject to harmless error review under the more stringent *Chapman* standard. (*Thomas*, *supra*, at pp. 643–644, 646.)

*Thomas* involved the trial court's refusal to give a requested instruction rather than a sua sponte duty to instruct and, on this basis, the *Thomas* court distinguished *Breverman's* holding that "failure to instruct sua sponte on voluntary manslaughter as a lesser necessarily included offense is reviewed under *Watson* ...." (*Thomas*, *supra*, 218 Cal.App.4th at p. 644, citing *Breverman*, *supra*, 19 Cal.4th at p. 149.) The *Thomas* court also reasoned that "[i]f provocation is

---

[8] We note the jury instruction on forcible lewd conduct given by the trial court identified attempted forcible lewd conduct as a lesser included offense. (Judicial Council of Cal., Crim. Jury Instns. (2017) Bench Notes to CALCRIM No. 1111, p. 955.) As previously stated, the record does not permit us to discern whether an instruction on attempted forcible lewd conduct was discussed.

[9] Under *Chapman*, courts "must determine whether it is clear beyond a reasonable doubt that a rational jury would have rendered the same verdict absent the error." (*People v. Merritt* (2017) 2 Cal.5th 819, 831; accord, *Neder v. United States* (1999) 527 U.S. 1, 15–16; *People v. Gonzalez* (2012) 54 Cal.4th 643, 663). "[I]n order to conclude that an instructional error ' "did not contribute to the verdict" ' within the meaning of *Chapman* [citation] [courts] must ' "find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." ' [Citations.]" (*People v. Brooks* (2017) 2 Cal.5th 674, 742.)

13

properly presented in a murder case, then, proving the element of malice requires the People to prove the absence of provocation beyond a reasonable doubt" (*Thomas*, *supra*, at p. 644, citing *People v. Rios* (2000) 23 Cal.4th 450, 462) and " '[j]ury instructions relieving the prosecution of the burden of proving beyond a reasonable doubt each element of the charged offense violate the defendant's due process rights under the federal Constitution.' " (*Thomas*, *supra*, at p. 644, quoting *People v. Flood* (1998) 18 Cal.4th 470, 491.)

As in *Breverman* and as distinguishable from *Thomas*, the error here involves a sua sponte duty to instruct rather than the refusal to give a requested instruction. (See *People v. Peau* (2015) 236 Cal.App.4th 823, 830 ["*Thomas* does not necessarily resolve whether an error in failing to give ... an instruction sua sponte is also one of federal constitutional dimension."].) Moreover, defendant does not claim the instructional error here relieved the prosecution of its burden of proving each element of the offense by a reasonable doubt, thereby violating his right to due process. (See *People v. Ngo*, *supra*, 225 Cal.App.4th at p. 158, fn. 20, citing *Thomas*, *supra*, 218 Cal.App.4th at p. 643.) Accordingly, we find defendant's reliance on *Thomas* unpersuasive in this context. (See *People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1146 ["The full import of *Thomas* is ... unclear."].) We are bound by the decisions of our high court (*K.R. v. Superior Court* (2017) 3 Cal.5th 295, 308–309) and, therefore, we apply *Watson* to the claim presented here (*People v. Banks*, *supra*, 59 Cal.4th at p. 1161; *People v. Ngo*, *supra*, at p. 158).

Under *Watson*, the harmless error test " 'focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.' " (*People v. Beltran*, *supra*, 56 Cal.4th at p. 956, quoting *Breverman*, *supra*, 19 Cal.4th at p. 177.)

This is, as defense counsel argued at trial, a "he said, he said case." (See *People v. Jones* (1990) 51 Cal.3d 294, 322 [recognizing credibility is usually the issue in these cases].) However, the prosecution's case was strong. We need not exhaustively recite every detail adduced, but M.H. was 13 years old, the trial occurred only months after the offenses and M.H. described in clear testimony a long car ride during which defendant talked about sexually explicit matters. During the ride, defendant fondled himself and had an erection.

Once at the motel, defendant turned down a room with two beds in favor of a room with only one bed, and he told M.H. they were both going to take showers because he wanted M.H.'s bottom clean. After defendant emerged from the shower, he dropped his towel and laid down next to M.H. on the bed naked with his penis fully exposed. He changed the television channel to a pornographic movie and fondled himself. He also urged M.H. to touch him and to put his penis in M.H.'s mouth, and he tried to force M.H.'s hand and head to his penis. M.H. was in touch with his mother and sisters during the trip and M.H.'s mother was so concerned by what he told her that she called him every 30 to 60 minutes, eventually telling him to run and call 911. Moreover, M.H.'s testimony was corroborated in part by Deputy Diaz, who saw the pornographic movie playing in the motel room and observed defendant's erection, and by some of defendant's own testimony and admissions.

>The defense case centered on persuading the jury that M.H. lacked credibility, that defendant had a good character and that defendant neither touched M.H. sexually nor had any sexual intentions toward M.H. The jury necessarily considered this evidence in the context of defendant's admissions that he watched a pornographic movie in M.H.'s presence, talked to M.H. about having sex with strangers and took Viagra in preparation for a possible sexual encounter. As well, although defendant denied he had an erection during police questioning or told Deputy Diaz he was aroused, these statements were inconsistent with his recorded statement to police.
>
>Defendant acknowledges the jury was instructed on nonforcible lewd conduct and attempted nonforcible lewd conduct, but argues the jury faced "an all-or-nothing choice between convicting [defendant] of committing a forcible lewd act or acquitting him of that charge" and the jury "opted to convict [him] of the only crime available to them." We do not agree the jury was given an all or nothing choice in this case but, in any event, we conclude the asserted error was harmless.[10] This case did not involve evidence of force separate and apart from that which also constituted the lewd touching that was alleged. Thus, evidence of attempted forcible lewd conduct was, at best, so weak as to be insubstantial. If the jury believed defendant, the requisite intent would have been absent and defendant was entitled to acquittal. If the jury believed M.H., as it did here, the forcible lewd acts were complete when defendant pushed M.H.'s hand and head toward his penis.[11] Under these circumstances, we conclude it is not reasonably probable the jury would have reached a more favorable result even if it had been instructed on attempted forcible lewd conduct. (See *People v. Banks*, *supra*, 59 Cal.4th at p. 1161; *People v. Prince* (2007) 40 Cal.4th 1179, 1267–1268.)

Oquita, 2018 WL 1281971, at *6–10 (footnotes in original).

Here, Petitioner asserts that the trial court violated the Due Process Clause of the Fourteenth Amendment by failing to instruct the jury on a lesser offense. (ECF No. 1 at 5). The Court construes Petitioner's argument to be that the trial court erred in failing to sua sponte instruct the jury on the lesser included offense of attempted forcible lewd conduct, as Petitioner argued on direct appeal. See Allen v. Calderon, 408 F.3d 1150, 1153 (9th Cir. 2005) ("[T]he district court must construe pro se habeas filings liberally.").

---

[10] The California Supreme Court has recognized that "insofar as the duty to instruct applies regardless of the parties' requests or objections, it prevents the 'strategy, ignorance, or mistakes' of *either* party from presenting the jury with an 'unwarranted all-or-nothing choice,' encourages 'a verdict ... no harsher *or more lenient* than the evidence merits' [citation], and thus protects the jury's 'truth-ascertainment function' [citation]. 'These policies reflect concern [not only] for the rights of persons accused of crimes [but also] for the overall administration of justice.' " (*Breverman*, *supra*, 19 Cal.4th at p. 155; accord, *People v. Eid* (2014) 59 Cal.4th 650, 657–658.) However, the court also "noted the danger of all-or-nothing verdict choices as a basis for the instructional rule" and stated it had "never intimated that the rule is satisfied once the jury has *some* lesser offense option, so that the court may limit its sua sponte instructions to those offenses or theories which seem strongest on the evidence, or on which the parties have openly relied. On the contrary, ... the rule seeks the most accurate possible judgment by 'ensur[ing] that the jury will consider the *full range of possible verdicts*' included in the charge, regardless of the parties' wishes or tactics." (*Breverman*, *supra*, at p. 155; accord, *People v. Eid*, *supra*, at pp. 657–658.)

[11] Alternatively, had the jury believed M.H.'s testimony but determined the lewd touching was not forcible, it had the option of convicting defendant of either nonforcible lewd conduct or attempted nonforcible lewd conduct.

1   In Beck v. Alabama, 447 U.S. 625 (1980), the Supreme Court held that due process is violated in a *capital* case "when the jury was not permitted to consider a verdict of guilt of a lesser included non-capital offense, and when the evidence would have supported such a verdict." 447 U.S. at 627. Beck expressly declined to decide whether due process would require giving a lesser included offense instruction in non-capital cases. Id. at 638 n.14. The Ninth Circuit has declined to extend Beck to non-capital cases, and "[u]nder the law of this circuit, the failure of a state trial court to instruct on lesser included offenses in a non-capital case does not present a federal constitutional question." Windham v. Merkle, 163 F.3d 1092, 1106 (9th Cir. 1998) (citing Turner v. Marshall, 63 F.3d 807, 819 (9th Cir. 1995)).

Therefore, Petitioner is not entitled to federal habeas relief regarding his claim that the trial court violated the Due Process Clause of the Fourteenth Amendment by failing to instruct the jury on a lesser offense.[12]

**V.**

**RECOMMENDATION**

Based on the foregoing, the undersigned HEREBY RECOMMENDS that the petition for writ of habeas corpus be DENIED.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within **THIRTY (30) days** after service of the Findings and Recommendation, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and filed within fourteen (14) days after service of the objections. The assigned District Judge will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time

---

[12] Although "the *refusal* by a court to instruct a jury on lesser included offenses, when those offenses are consistent with defendant's theory of the case, may constitute a cognizable habeas claim," Solis v. Garcia, 219 F.3d 922, 929 (9th Cir. 2000) (emphasis added), the record in this case does not show that the trial court refused a lesser included offense instruction requested by the defense. (1 CT 145–46; 2 RT 230).

may waive the right to appeal the District Court's order. <u>Wilkerson v. Wheeler</u>, 772 F.3d 834, 839 (9th Cir. 2014) (citing <u>Baxter v. Sullivan</u>, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated: **November 6, 2019**

_____
UNITED STATES MAGISTRATE JUDGE